# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO.;<br>ARTHUR J. GALLAGHER RISK<br>MANAGEMENT SERVICES, INC., | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | C.A. No. 2024-0494-LWW |
| JOSEPH A. AGIATO, JR. (individually<br>and as Sellers' Representative), | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## MEMORANDUM OPINION

Date Submitted: April 11, 2025
Date Decided: July 31, 2025

Blake Rohrbacher, Katharine L. Mowery & John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Stephen D'Amore, Michael Skokna & Christian Gray, WINSTON & STRAWN LLP, Chicago, Illinois; Angela Machala & Peyton Sherwood, WINSTON & STRAWN LLP, Los Angeles, California; Spencer Churchill, WINSTON & STRAWN LLP, Washington, D.C.; *Counsel for Plaintiffs Arthur J. Gallagher & Co. and Arthur J. Gallagher Risk Management Services, Inc.*

Brian E. Farnan & Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Vineet Bhatia & Armando Lozano, SUSMAN GODFREY LLP, Houston, Texas; Stephen Morrissey, SUSMAN GODFREY LLP, Seattle, Washington; *Counsel for Defendant Joseph A. Agiato, Jr.*

**WILL, Vice Chancellor**

This dispute concerns the plaintiffs' purchase of two companies for an upfront cash payment plus contingent earnout payments. The earnouts were tied to the acquired businesses meeting revenue thresholds in each of four years. Although the first year's threshold was met, the plaintiffs withheld the corresponding payment. They assert that the sellers failed to uphold other terms of the deal on which the earnout is purportedly conditioned, and seek indemnification for these alleged breaches of contract.

The sellers' representative has moved for partial judgment on the pleadings, raising two key issues. First, he argues that the initial earnout payment is due. I agree, as the sole condition for it has been satisfied. Second, he seeks the release of escrowed shares, which were set aside as security for indemnity claims. Resolving that issue is precluded by factual disputes.

The motion is therefore granted in part and denied in part.

I.  **FACTUAL BACKGROUND**

The following description is drawn from undisputed facts in the pleadings and documentary exhibits the parties submitted.[1]

---

[1] Verified Compl. (Dkt. 1) ("Compl."); Agiato's Verified Answer and Countercls. to Gallagher's Verified Compl. (Dkt. 4) 14-47 ("Answer"); Agiato's Verified Answer and Countercls. to Gallagher's Verified Compl. (Dkt. 4) 48-84 ("Countercls."); Pls.' Corr. Reply to Agiato's Verified Countercls. (Dkt. 16) ("Reply"). Exhibits to Agiato's Answer and Counterclaims are cited as "Agiato's Ex. __." Exhibits to the Complaint are cited as "Compl. Ex. __."

## A. The Asset Purchase Agreement

Defendant Joseph A. Agiato, Jr. is a North Carolina resident.[2] He is the founder and former CEO of Patent Insurance Underwriting Services, LLC ("PIUS") and Newlight Capital, LLC (with PIUS, the "Sellers").[3] The Sellers were involved in originating, underwriting, structuring, and collecting loans to early-stage companies collateralized by intellectual property.[4] Before their sale, Agiato owned 78% of PIUS and 100% of Newlight.[5]

Arthur J. Gallagher Risk Management Services, Inc. is an Illinois corporation providing risk management and insurance services.[6] It is a subsidiary of defendant Arthur J. Gallagher & Co., a Delaware corporation (with Arthur J. Gallagher Risk Management Services, Inc., "Gallagher").[7]

On November 8, 2022, Gallagher entered into an Asset Purchase Agreement (the "APA") with the Sellers and their members.[8] Agiato signed the APA individually as a member and as the "Sellers' Representative."[9]

---

[2] Countercls. ¶ 11.

[3] Answer ¶ 10; Countercls. ¶ 11.

[4] Compl. ¶ 27; Answer ¶ 27; Countercls. ¶¶ 26-27.

[5] Compl. Ex. 2 (Sellers' Disclosure Sched.) ¶ 6(b).

[6] Answer ¶ 9; Countercls. ¶¶ 12-13.

[7] Answer ¶ 9; Countercls. ¶¶ 12-13.

[8] Answer ¶ 2.

[9] Compl. Ex. 1 ("APA") 1; *see also id.* § 9(h) (appointing Agiato Sellers' Representative).

### 1. Earnout Payments

Gallagher paid an upfront $50 million purchase price.[10] It also agreed to make up to $150 million in possible earnout payments.[11] The earnout payments were contingent on the "New PIUS Division"—PIUS and Newlight operating as a division of Gallagher—achieving Net Commissions and Fee Income ("NCFI") thresholds detailed in Appendix I to the APA.[12] NCFI is an "all agency bill" including due diligence fees, origination fees, loan monitoring fees, and policy commissions paid on policies placed by PIUS.[13]

The Addendum specified a "Base NCFI" for each of the four years.[14] The earnout payment would be equal to a 7.15 multiple on actual NCFI above the Base NCFI, capped at $50 million per year (with an aggregate cap of $150 million).[15]

---

[10] *Id.* § 4(a)(i) (providing for a total purchase price of $46,250,000.01 (divided into four components) plus the "Escrow Deposit"); *id.* § 1 ("'Escrow Deposit' means $3,750,000 of Gallagher Common Stock . . . .").

[11] Countercls. ¶ 32; APA § 4(b); APA Addendum I.

[12] APA § 4(b); *id.* at Addendum I; *see also id.* (defining the "New PIUS Division" as "the Acquired Business operating as a division of Gallagher"); APA § 2(a)(i) (defining PIUS and Newlight as the "Acquired Business").

[13] Countercls. ¶¶ 33-34; APA Addendum I at 2. Addendum I explains that certain items— "[c]ontingent commissions, profit sharing, [and] supplemental, bonus commissions"—are to be accounted for on a cash basis in calculating NCFI. APA Addendum I at 2.

[14] APA Addendum I at 1.

[15] *Id.* at 1-2. The Base NCFI in Year 1 was $13 million, meaning the Sellers would receive a Year 1 earnout payment of 7.15 times each dollar earned above that amount, up to a maximum of $50 million. *Id.*

3

NCFI is recognized as cash is received.[16]  If NCFI exceeds a "Target NCFI" for any given year, the excess is carried over into the next year.[17]

2.     <u>Sellers' Representations and Warranties</u>

Section 6 of the APA contains representations and warranties made to Gallagher by the "Sellers and the[ir] [m]embers jointly and severally," including Agiato as a member of the Sellers.[18]  They include the following:

- **§ 6(g)(i)**: "Except as set forth in Paragraph 6(g) of the [d]isclosure [s]chedule, since December 31, 2021 . . . the business of the Sellers has been conducted only in the Ordinary Course of Business";

- **§ 6(o)**: "Except as set forth in Paragraph 6(o) of the [d]isclosure [s]chedule, neither Sellers nor any manager or member of Sellers or any Associate of Sellers or of such persons have any direct or indirect interest in any firm, corporation, association or business enterprise which competes with, is a customer or sales agent of or is engaged in any insurance business of the kind being conducted by Sellers"; and

- **§ 6(o)**: "Except for employment relationships and compensation, benefits and travel advances in the Ordinary Course of Business, neither Sellers nor any manager or member of Sellers or any Associate of such persons have any interest, directly or indirectly, in any contract with, commitment or obligation of or to, or claim against Sellers."[19]

---

[16] *Id.* at 2.

[17] *Id.* at 1.

[18] APA § 6.

[19] *Id.* §§ 6(g)(i), 6(o).  "Ordinary Course of Business" means, "in respect of any Person, the ordinary course of such Person's business as conducted by such Person in accordance with past practice and undertaken by such Person in good faith."  *Id.* § 1.

The Sellers and their members were to disclose any exceptions to these representations and warranties in a formal disclosure schedule.[20] The parties agreed that the Sellers' representations and warranties were "not affected by any information" obtained or received outside of these formal disclosures.[21] Neither the Sellers nor their members (including Agiato) made any disclosures pertaining to Sections 6(g)(i) or 6(o) in the accompanying disclosure schedule.[22]

Section 9(b) of the APA gives Gallagher a right to indemnification for the "breach of, or the failure to fulfill, any representation, warranty, agreement, or covenant" in the APA.[23] To make an indemnification claim, the claimant must "promptly" provide written notice to the indemnitor "setting forth all specifics of the [c]laim then known by the [c]laimant."[24] Claims are subject to a threshold amount ($200,000 in the aggregate or $5,000 per claim) that must be exceeded for the

---

[20] *Id.* §§ 6(g)(i), 6(o).

[21] *Id.* § 9(a) ("The representations and warranties of a party hereto shall not be affected by any information furnished to, or investigations made by, the other party or any of its employees, attorneys, accountants or other representatives in connection with the subject matter of [the APA] . . . .").

[22] Compl. Ex. 2 ¶ 6.

[23] APA § 9(b)(ii)(A).

[24] *Id.* § 9(d)(i); Countercls. ¶ 74.

claimant to obtain indemnification or reimbursement of associated expenses.[25] Indemnification is capped at the purchase price paid to the Sellers.[26]

### 3.    Agiato's Post-Closing Obligations

The APA imposed obligations related to the New PIUS Division's operation. For example, Section 4(b) includes an assurance that "[f]ollowing the [c]losing, regardless of the effect on the [e]arnout, the continuing New PIUS Division . . . shall conduct its business in accordance with Gallagher's business practices, policies and procedures."[27]  It adds that the "New PIUS Division will be managed for the long-term benefit of Gallagher's shareholders."[28]

## B.    The Escrow Agreement

Concurrent with the APA, Gallagher and Agiato (as Sellers' Representative) entered into an Escrow Agreement.[29]  The parties agreed that "Sellers shall deliver $3,750,000 of Gallagher Common Stock" (the "Escrowed Shares") to the escrow agent "[a]s security for the indemnification obligations of Sellers and [their m]embers."[30]

---

[25] APA § 9(g)(i)(A)-(B).

[26] *Id.* § 9(g)(ii).

[27] *Id.* § 4(b)(ix).

[28] *Id.* § 4(b)(x).

[29] Agiato's Ex. 6 ("Escrow Agreement").

[30] *Id.* § 1; *see also* Countercls. ¶¶ 66-67.

If Gallagher became "entitled to indemnification pursuant to the provisions of the [APA]" and "written notice" was given to the escrow agent and members as "provided in Section 9 of the [APA]," the Escrowed Shares would be used to satisfy the Sellers' indemnification obligations to Gallagher.[31]   Otherwise, the Escrowed Shares would be released to the Sellers "[i]f 18 months from the date hereof no notice ha[d] been received by [the] [e]scrow [a]gent from Gallagher that the Escrowed Shares are subject to an indemnification claim pursuant to the [APA] or that a dispute has arisen with respect to the Escrowed Shares."[32]

The Escrow Agreement requires that written notice be delivered to Gallagher's General Counsel if an indemnity claim is made against Gallagher, and to Agiato if it is made against the Sellers.[33]   It further directs that the Sellers' counsel—Kerry T. Smith, Esq. of M&H, LLP—be notified.[34]   According to Gallagher, in March 2024, Smith asked that he and M&H be "removed from all notice provisions in all agreements relating to Gallagher's PIUS division."[35]

---

[31] Escrow Agreement § 3.

[32] *Id.*

[33] *Id.* § 7.

[34] *Id.*

[35] Agiato's Ex. 7 ("Gallagher's May 7 Letter") 2 n.2.

7

## C. The Employment Agreement

When the APA closed, Agiato signed an Employment Agreement with Gallagher to manage the New PIUS Division.[36] Agiato's execution of the Employment Agreement was "a condition to the consummation of the [t]ransaction" contemplated by the APA.[37]

In the Employment Agreement, Agiato agreed to a four-year tenure "unless earlier terminated by either party" with "21 days written notice to the other party."[38] The Employment Agreement allowed Gallagher to terminate Agiato "with no liability" under certain conditions, including for "Cause."[39]

Agiato was promised a $600,000 annual base salary plus up to $400,000 for achieving specified "key strategic initiatives."[40] In return, the Employment Agreement obligated Agiato to "devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities."[41] He was required to "comply with all [Gallagher] policies and

---

[36] Agiato's Ex. 2 Ex. A ("Employment Agreement").

[37] APA 1 (Recitals).

[38] Employment Agreement §§ 1, 5(A).

[39] *Id.* § 5(B). The Employment Agreement details the events which, if deemed in good faith by Gallagher to have occurred, would have constituted "Cause." *Id.* § 5(B)(3).

[40] *Id.* §§ 3(A)-(B).

[41] *Id.* § 2(A).

8

procedures in effect and applicable to him."[42]    He was also prohibited from "engag[ing] in any aspect of the insurance business for or on behalf of any person or entity other than [Gallagher] . . . [or] in any activity inimical to the best interests of [Gallagher]."[43]

### D.    The Earnout Dispute

The "Year 1" earnout was based on NCFI earned between November 1, 2022 and October 21, 2023.[44]    Gallagher was to deliver an earnout statement for that period within 90 days of the first anniversary of the transaction—by February 6, 2024.[45]

Gallagher did not deliver an earnout statement in February.[46]    On March 4, it sent Agiato a letter purporting to fire him for cause.[47]    It explained that no earnout payment would be made:

> As to Year 1 [e]arnout payments specifically, the revenue, commissions, and fees derived from transactions involving [a third party] were not earned in compliance with your obligations under the APA and Employment Agreement and, thus, must be excluded from calculations of the New PIUS Division's [NCFI].    After such exclusion, the New PIUS Division's NCFI for Year 1

---

[42] *Id.*

[43] *Id.*

[44] Countercls. ¶ 39; Reply ¶ 39; APA Addendum I at 1.

[45] *See* APA § 4(b); APA Addendum I at 1.

[46] Countercls. ¶ 41; Reply ¶ 41.

[47] Agiato's Ex. 2 at 1-2.

failed to meet necessary thresholds to trigger an [e]arnout payment.[48]

Gallagher also acknowledged its obligation to furnish an earnout statement and attached calculations showing NCFI of $12,722,225, which excluded certain cash payments it felt should not count toward the total.[49]

Agiato responded two days later in his capacity as Sellers' Representative. He wrote that "NCFI for Year 1 was in excess of $28.4 million," meaning that "the maximum [e]arnout of $50 million for Year 1 was earned by the Sellers and members with a carryover to Year 2 of more than $8.4 million applicable to the NCFI for Year 2."[50] He requested Gallagher's "books, records, and work papers" used to calculate NCFI and a detailed breakdown of the revenue received by the New PIUS Division in Year 1.[51]

Gallagher ignored Agiato's letter and a subsequent email.[52] On March 19, Agiato followed up through counsel to dispute Gallagher's NCFI calculations and again request books and records.[53] His counsel demanded that Gallagher participate

---

[48] *Id.* at 2.

[49] *Id.* at 2, Ex. B.

[50] Agiato's Ex. 3 at 1.

[51] *Id.*

[52] *See* Agiato's Ex. 4 at 1.

[53] *Id.* at 1-2.

in the contractual dispute resolution process.[54]  Under this process, outlined in Section 4(b) of the APA, if the parties could not resolve any disagreement on Gallagher's earnout statement within 60 days, either party could submit the dispute to an accountant "for final resolution."[55]

On April 3, Gallagher responded that the earnout dispute resolution process in the APA was "inapposite" because Agiato's alleged misconduct was at issue—not "an accounting dispute over how [e]arnout payments (if owed) should be calculated."[56]  It claimed that one of the transactions it excluded when calculating NCFI had been improperly omitted from the Sellers' disclosure schedule.[57]  It explained that it had "made the accounting decision to reverse the booking of revenues associated with several of the transactions entered into by [] Agiato during Year 1 of the [e]arnout period" because such transactions were, in its view, contrary to Agiato's obligations and "not reflective of the actual, long-term value of the

---

[54] *Id.* at 2; *see* APA § 4(b)(i) (outlining the dispute resolution process).

[55] APA § 4(b)(i)-(ii); *see also id.* § 1 (defining the "Accountants" as "Grant Thornton, LLP").  Agiato's counsel followed up in writing and by phone on March 21.  *See* Agiato's Ex. 5 ("Gallagher's Apr. 3 Letter") 1.

[56] Gallagher's Apr. 3 Letter 1-2.

[57] *Id.* at 2; *see supra* notes 18-20 and accompanying text (describing these representations and warranties).

acquired business."[58]  It attached another spreadsheet showing NCFI of $12,722,225 based on the "revers[als]" described in its letter.[59]

### E. The Escrowed Shares Withholding

The APA and Escrow Agreement require Gallagher to deliver notice of any indemnification claim to the escrow agent and Agiato before May 8, 2024.[60]  The Escrow Agreement explains that notice sent "after normal business hours" will be considered sent the next day.[61]

On May 7, at 6:50 p.m. Central Time, Gallagher emailed the escrow agent and Agiato a letter purportedly serving as "written notice to the [m]embers and escrow agent pursuant to the terms of the Escrow Agreement as it relates to the indemnification to which Gallagher is entitled under the APA."[62]  Gallagher

---

[58] Gallagher's Apr. 3 Letter 3.

[59] *Id.* at 5; *see supra* note 49 and accompanying text.

[60] Escrow Agreement § 3 (requiring notice to the escrow agent within 18 months of November 8, 2022, when the Escrow Agreement was signed).

[61] Countercls. ¶ 94; Escrow Agreement § 7 (requiring notice, if sent by email, to be "sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient").

[62] Gallagher's May 7 Letter 2.  Its indemnification claim was based on purported "adverse consequences" suffered because of (1) PIUS's alleged breach of post-acquisition obligations; (2) the Sellers' and members' alleged breaches of representations and warranties; and (3) Agiato's for-cause termination. *Id.*

requested the return of the full amount held in escrow as indemnification.[63] As a result, the Escrowed Shares were withheld from the Sellers.

## F. This Litigation

Gallagher initiated this litigation on May 10, advancing breach of contract and declaratory judgment claims against Agiato (both individually and as Sellers' Representative).[64] On June 7, Agiato answered the Complaint and brought counterclaims against Gallagher for breach of the APA and the Escrow Agreement, and for restitution.[65]

The dispute narrowed on November 27, when Gallagher stipulated that the Year 1 NCFI threshold was met.[66]

On January 10, 2025, Agiato moved for partial judgment on the pleadings.[67] The motion was fully briefed as of February 27,[68] and I held argument on April 11.[69]

---

[63] *Id.* at 2-4.

[64] Compl. ¶¶ 59-86.

[65] *See* Countercls. ¶¶ 104-59.

[66] Stip. and Order Resolving Defs.' Mot. to Compel Earnout Dispute Resolution Process (Dkt. 53) ("NCFI Stip.") ¶ 1.a-b; *see infra* notes 88-89 and accompanying text.

[67] Agiato's Opening Br. in Supp. of Mot. for Partial J. on the Pleadings (Dkt. 60) ("Agiato's Opening Br.").

[68] Pls.' Answering Br. in Opp'n to Def.'s Mot. for Partial J. on the Pleadings (Dkt. 70) ("Gallagher's Answering Br."); Def.'s Reply Br. in Supp. of Mot. for Partial J. on the Pleadings (Dkt. 76) ("Agiato's Reply Br.").

[69] Tr. of Apr. 11, 2025 Oral Arg. on Def.'s Mot. for Partial J. on the Pleadings (Dkt. 100) ("Oral Arg. Tr.").

## II. ANALYSIS

Agiato's motion for partial judgment on the pleadings centers on two main issues.

The first issue is whether Gallagher must make the Year 1 earnout payment.[70] It implicates Gallagher's Count III (whether Agiato's conduct relieved Gallagher of its obligation to pay the earnout) and Agiato's Count II (whether Gallagher breached the APA by failing to make earnout payments).[71]

The second issue is whether Gallagher must immediately release the Escrowed Shares—either because Gallagher failed to provide timely notice of indemnity claims or because those claims lack merit.[72] It implicates Gallagher's Counts I and II (whether Agiato breached the APA by failing to comply with representations and warranties and to manage the business as required) and Agiato's Count V (whether Gallagher breached the Escrow Agreement by failing to release the Escrowed Shares).[73]

The court may grant judgment on the pleadings "only when, accepting as true all of the nonmoving party's well-pleaded factual allegations, 'there is no material

---

[70] Agiato's Opening Br. 24.

[71] Compl. ¶¶ 73-79; Countercls. ¶¶ 122-32.

[72] Agiato's Opening Br. 29.

[73] Compl. ¶¶ 59-72; Countercls. ¶¶ 151-59.

fact in dispute and the moving party is entitled to judgment as a matter of law.'"[74] Although inferences are drawn in favor of the non-movant, the court "need not blindly accept as true all allegations, nor must it draw all inferences . . . in [the non-movant's] favor unless they are reasonable inferences."[75] "On a Rule 12(c) motion, the Court may consider documents integral to the pleadings, including documents incorporated by reference and exhibits attached to the pleadings, and facts subject to judicial notice."[76]

"The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal."[77] Thus, "judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts."[78]

The APA is governed by Delaware law.[79] "Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that

---

[74] *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *8 (Del. Ch. June 30, 2004) (citation omitted).

[75] *Id.* at *8 (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 327 (Del. Ch. 2003)).

[76] *Jiminez v. Palacios*, 250 A.3d 814, 827 (Del. Ch. 2009), *aff'd*, 237 A.3d 68 (Del. 2020).

[77] *Klair v. Reese*, 531 A.2d 219, 222 (Del. 1987) (citing Restatement (Second) of Contracts § 212, cmt. d (1981); 4 Williston on Contracts § 616 (3d ed. 1961)).

[78] *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *10 (Del. Ch. Dec. 19, 2017).

[79] APA § 19(a).

which would be understood by an objective, reasonable third party."[80]  "When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement.'"[81]  The court must construe the contract "as a whole and will give each provision and term effect, so as not to render any part of the contract mere surplusage."[82]  It will not look outside an agreement's plain terms, so long as they are unambiguous.[83]  Ambiguity exists if "the provisions in controversy are fairly susceptible of different interpretations."[84]

The Escrow Agreement is governed by Illinois Law.[85]  "The rules governing Illinois contractual interpretation generally track those of Delaware."[86]

---

[80] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[81] *Id.* at 368 (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[82] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010)).

[83] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[84] *Eagle Indus.*, 702 A.2d at 1232.

[85] Escrow Agreement § 8.

[86] *Am. Bottling Co. v. BA Sports Nutrition, LLC*, 2021 WL 6068705, at *8 (Del. Super. Dec. 15, 2021).

## A.     Earnout Payments

The APA provides that an earnout payment is due to the Sellers and "Key Employees" if the New PIUS Division achieves over $20,000,000 in NCFI during Year 1.[87]  Gallagher has stipulated that "the amount of cash generated and received by the New PIUS Division equaled or exceeded $20,000,000" during that period.[88]  It has also stipulated that "[a]t least $20,000,000 of Year 1 [c]ash [r]eceipts fell into the six categories comprising NCFI, as set forth in Addendum I to the APA."[89]

Still, Gallagher insists that it is excused from paying the Year 1 earnout.  It grounds this argument in three APA provisions that: (1) confirm the New PIUS Division will be run according to Gallagher's practices and policies and for the benefit of Gallagher's shareholders;[90] (2) condition the transaction on Agiato's execution of the Employment Agreement;[91] and (3) contain representations and warranties by the Sellers in Section 6.[92]

None of these provisions bear on whether Gallagher owes the Year 1 earnout.  Although Gallagher requests I imply conditions to payment of the earnout, Delaware

---

[87] APA § 4(b); APA Addendum I at 1; Reply ¶ 10.

[88] NCFI Stip. ¶ 1.a.

[89] *Id.* ¶ 1.b.

[90] Compl. ¶ 31.

[91] *Id.* ¶ 47.

[92] *Id.* ¶¶ 20-30.

17

courts "cannot rewrite contracts or supply omitted provisions."[93] The APA places no conditions on payment of the earnout once the NCFI threshold is achieved. Because it is undisputed that the NCFI threshold for Year 1 was met, the corresponding earnout payment is past due and owed to the Sellers.

### 1. Post-Closing Operations Under Section 4(b)

Gallagher asserts that "Agiato failed to conduct the business of the New PIUS Division in accordance with Gallagher's business practices, policies, and procedures and failed to manage the New PIUS Division for the long-term benefit of Gallagher's shareholders."[94] In its view, Agiato's purported mismanagement "represents a failure of a condition precedent to [the] [e]arnout payments."[95]

Gallagher's argument rests on APA Sections 4(b)(ix) and 4(b)(x), which Gallagher reads as imposing on Agiato "obligations related to the post-acquisition operation[] of . . . [the] New PIUS Division."[96] Section 4(b)(ix) states that "[f]ollowing the [c]losing, regardless of the effect on the [e]arnout, the continuing New PIUS Division . . . shall conduct its business in accordance with Gallagher's business practices, policies and procedures . . . ."[97] Section 4(b)(x) states that the

---

[93] *Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 355 (Del. 2020).

[94] Compl. ¶ 35.

[95] *Id.* ¶ 75.

[96] *Id.* ¶ 31.

[97] APA § 4(b)(ix).

"New PIUS Division will be managed for the long-term benefit of Gallagher's shareholders."[98]

Neither Section 4(b)(ix) nor Section 4(b)(x) creates a condition precedent to the earnout payment. Although "'[t]here are no particular words that must be used to create a condition precedent,' a condition precedent must be expressed clearly and unambiguously."[99] "Parties' intent to set a condition precedent to performance may be evidenced by such terms as 'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance" connoting "an intent for a condition rather than a promise."[100] APA Section 4 lacks this conditional language.[101]

Instead, Sections 4(b)(ix) and 4(b)(x) unambiguously address how *Gallagher* will manage the New PIUS Division after closing. The Sellers bargained for some limited protections, including that Gallagher must "operate [PIUS and Newlight] in a manner not intentionally designed for the purpose of avoiding or reducing any

[98] *Id.* § 4(b)(x).

[99] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. July 29, 2021) (citation omitted).

[100] *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) (cleaned up) (citing 13 Williston on Contracts § 38.16, Westlaw (database updated May 2022)).

[101] In fact, the language in Section 4 of the APA is permissive. It states that "*regardless of* the effect on the [e]arnout . . . the . . . New PIUS Division . . . shall conduct its business "in accordance with [its] business practices, policies, and procedures . . . ." APA § 4(b)(ix) (emphasis added).

"[e]arnout payments" and refrain from performing certain actions.[102] But Sections 4(b)(ix) and 4(b)(x) balance these protections by ensuring that Gallagher has discretion to run the business consistent with its own policies and for the "long-term benefit of Gallagher's shareholders," "regardless of the effect on the [e]arnout."[103]

Gallagher's reading of the APA is inconsistent with this structure.[104] Nothing in the APA grants Agiato authority to direct the New PIUS Division's operations after closing. Agiato was never an officer or director of Gallagher or its affiliates. The APA lets *Gallagher* run the New PIUS Division to serve *Gallagher's* interests— even if the earnout is affected—so long as it does not "intentionally" avoid or reduce the earnout.[105]

Gallagher's argument is further belied by other APA provisions. When the parties wanted to impose obligations on Agiato, the APA refers to him by name or as the Sellers' Representative.[106] Section 4(b)(ix) and 4(b)(x), by contrast, make no

---

[102] *Id.* § 4(b)(viii).

[103] *Id.* § 4(b)(ix)-(x).

[104] *See Chi. Bridge & Iron Co. v. Westinghouse Elec. Co.*, 166 A.3d 912, 927 (Del. 2017) ("The basic business relationship between parties must be understood to give sensible life to any contract."); *see also Fortis Advisors LLC v. Johnson & Johnson*, 2024 WL 4048060, at *22 (Del. Ch. Sept. 4, 2024) (explaining that "[a] key point of tension in negotiating an earnout structure is allocating post-closing operational control").

[105] APA § 4(b)(viii).

[106] *See, e.g., id.* § 5(b)(iii) ("Joseph A. Agiato, Jr. shall have entered into a four-year employment agreement with Gallagher . . . ."); *id.* § 1 ("'Sellers' Representative' means Joseph A. Agiato, Jr."); *id.* §§ 4(b), 4(b)(iii), 4(b)(vii)-(viii), 4(d), 8(h), 9(d)(iv), 9(h), 10(c),

reference to Agiato or the Sellers' Representative in addressing how the New PIUS Division "shall conduct its business" or "will be managed."[107] They refer only to the management of New PIUS in the passive voice. That omission is presumably intentional and suggests the parties had no intention of imposing obligations on Agiato in Sections 4(b)(ix) and 4(b)(x).[108]

## 2. Provisions Related to Agiato's Employment

Gallagher next maintains that Agiato's compliance with his Employment Agreement is a condition precedent to payment of the earnout. It asserts that "one of the conditions of the transaction agreed to . . . was that Agiato would offer his services and connections to Gallagher as an employee pursuant to the terms of his Employment Agreement."[109] And it notes that the Employment Agreement "requires that Agiato comply with Gallagher's business practices, policies, and procedures."[110] Gallagher reads these provisions together to mean that its refusal to

---

15 (describing the rights and obligations of the Sellers' Representative); *id.* § 8(f)(i) (describing Agiato's personal noncompete requirement).

[107] *Id.* § 4(b)(ix)-(x).

[108] *Amkor Tech., Inc. v. Motorola, Inc.*, 2007 WL 3360039, at *6 (Del. Super. Nov. 14, 2007) ("The law does not favor including terms in a contract by implication. To the contrary, it presumes that terms that would have been easy to include in a contract but were not, were intentionally omitted by the parties."), *aff'd*, 958 A.2d 852 (Del. 2008); *see also supra* note 82 and accompanying text (explaining that the court must read the contract "as a whole" in interpreting a specific provision).

[109] Compl. ¶ 41.

[110] Employment Agreement § 2(A); *see supra* note 42 and accompanying text.

pay the earnout is justified by Agiato's purported breaches of his Employment Agreement and firing for (purported) cause.[111]

This argument finds no support in the APA. The APA merely required, "as a condition to the consummation of the [t]ransaction," that Agiato "execute" his Employment Agreement.[112] The Employment Agreement similarly specifies that the "execution of this Agreement is a condition to the effectiveness" of the APA.[113] It is undisputed that Agiato executed the Employment Agreement.[114] The APA is not conditioned on Agiato satisfying the terms of the Employment Agreement itself or on his continued employment.[115]

Gallagher posits that the coterminous four-year terms of the Employment Agreement and earnout create "deliberate alignment underscor[ing] that the [e]arnout was directly tied to Agiato's continued employment."[116] It highlights APA Section 5(b)(iii)—providing that Agiato "shall have entered into a four-year

---

[111] Compl. ¶¶ 41-44, 47-48, 69, 75.

[112] APA 1 (Recitals); *see also supra* note 37 and accompanying text.

[113] Employment Agreement 1.

[114] *See* Compl. ¶ 38 ("On the same day that they entered the APA, Gallagher and Agiato entered an Employment Agreement pursuant to which Gallagher hired Agiato to continue for four years in his role managing PIUS and Newlight following execution of the APA."); Countercls. ¶ 15 ("Agiato admits that he entered into an Employment Agreement to work for Gallagher.").

[115] *See supra* notes 99-100 (explaining that conditionality must be expressed unambiguously).

[116] Gallagher's Answering Br. 44.

employment agreement with Gallagher"—as evidence of the "unique, [e]arnout-linked nature" of the APA and the Employment Agreement.[117]  But neither contract draws this link explicitly.  For example, Section 5(b)(iii) falls within a section addressing deliverables and requires that Agiato must "have entered" into the Employment Agreement by closing.[118]  That condition was met: the Employment Agreement was signed, and the transaction was consummated.  The earnout is unmentioned.[119]

### 3.      Representations and Warranties in Section 6

Gallagher argues that in "addition to Agiato's failure to satisfy the express contractual conditions for receipt of the [e]arnout, any earnout is independently barred by Agiato's other material breaches of the APA."[120]  It alleges violations of three representations and warranties in APA Section 6: (1) that "the business of the Sellers ha[d] been conducted in the "Ordinary Course of Business"; (2) that Sellers

---

[117] *Id.* at 43.

[118] APA § 5(b)(iii).

[119] Gallagher also argues that a breach of the Employment Agreement is equivalent to a breach of the APA, since the agreements were executed contemporaneously.  For the two agreements to be read together, Gallagher would need to show that the parties "intended the[] documents to 'operate as two halves of the same business transaction.'" *See Segovia v. Equities First Hldgs., LLC*, 2008 WL 2251218, at *9 (Del. Super. May 30, 2008) (quoting *E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985)).  But even if Gallagher had shown that the agreements were meant to be read together, a breach of the Employment Agreement would not justify withholding the Year 1 [e]arnout. *See infra* Section II.A.3.

[120] Gallagher's Answering Br. 34.

and their members had no "direct or indirect interest" in competitors, customers, or agents of "any insurance business of the kind being conducted by Sellers"; and (3) that neither the Sellers nor their managers or members had "any interest, directly or indirectly, in any contract with, commitment or obligation of or to, or claim against Sellers."[121]

I need not resolve whether Gallagher identified a viable breach of the APA. Such a breach would provide it with grounds to seek indemnification—not to withhold the earnout.

The APA sets out an intricate process for one party to obtain renumeration from another for "breach of, or . . . failure to fulfill, any representation, warranty, agreement, or covenant" in the APA.[122] It describes the process for making a written claim, and sets both a base amount required to seek indemnification and a cap.[123] The Escrow Agreement facilitates the APA's indemnification process by ensuring that funds are set aside to compensate Gallagher for a valid indemnification claim.[124]

The APA's earnout provisions omit any reference to indemnification process. The APA also does not condition earnout payments to the Sellers on their fulfillment

---

[121] *Id.* at 34-36 (citing Compl. ¶¶ 25-30); *see* APA §§ 6(g), 6(o); *see also supra* note 19 (defining "Ordinary Course of Business"); *supra* notes 18-20 and accompanying text (detailing the relevant representations and warranties).

[122] APA § 9(b)(ii)(A); *see supra* note 23 and accompanying text.

[123] *See supra* notes 24-26 and accompanying text.

[124] *See* Escrow Agreement § 1.

24

of the representations and warranties in Section 6.  The sole condition to payment of the Year 1 earnout is meeting the NCFI threshold, which has indisputably occurred.[125]

Gallagher suggests that if Agiato's breaches were sufficiently material, Gallagher may be "excused from performance under [the APA]."[126]  And it argues that the materiality of Agiato's breaches cannot be determined on a motion for judgment on the pleadings.  But Gallagher cannot argue that its performance under the APA is excused while invoking the contractual indemnification process in Section 9.[127]  Its pursuit of indemnification "indicates a desire to continue to accept

---

[125] *See supra* note 66 and accompanying text.

[126] Gallagher's Answering Br. 38 (citing *Biolife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. Oct. 1, 2003)); *see also id.* (citing *SphereCommerce, LLC v. Caulfield*, 2022 WL 325952, at *7 (Del. Ch. Feb. 3, 2022) (defining a material breach as one that "goes to the root or essence of the agreement between the parties or touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract")). At oral argument, Gallagher's counsel clarified that it was not "rely[ing] on [a] separate breach" by Agiato or asserting material breach that would excuse it from performing the "rest of the contract."  Oral Arg. Tr. 67.  It was only arguing that "the earnout obligations were breached, and that's why the earnouts do not come due."  *Id.*  I rejected that argument above where I held that the earnout payments were not contingent on obligations imposed on *Gallagher* in APA Sections 4(b)(ix) and 4(b)(x).  *See supra* Section II.A.1.

[127] *See supra* Section I.E (describing Gallagher's withholding of the Escrowed Shares based on indemnification claims).

the benefits of the [APA] after the Sellers' alleged material breach."[128] Thus, it cannot avoid its own contractual responsibilities.[129]

*          *          *

The APA entitles the Sellers to an earnout payment if an annual NCFI threshold is met. Because that target was met for Year 1, and nothing in the APA or related agreements places other conditions on the earnout, Agiato is entitled to judgment in his favor on Agiato's Count II and Gallagher's Count III. The Sellers must make the $50 million Year 1 earnout payment.[130] Agiato is also entitled to prejudgment interest on this amount, compounded quarterly.[131]

## B.    Escrowed Shares

In the Escrow Agreement, the Sellers agreed to deliver the Escrowed Shares to an escrow agent as security for their indemnification obligations in the APA.[132] The escrow agent was to release the Escrowed Shares after 18 months absent a valid

---

[128] *Post Hldgs., Inc. v. NPE Seller Rep LLC*, 2018 WL 5429833, at *5 (Del. Ch. Oct. 29, 2018).

[129] *Id.* at *5 (holding that buyers had to perform and remit tax refunds to the sellers, "irrespective of whether the [s]ellers materially breached the [a]greement," since the buyers were pursuing a contractual indemnification process).

[130] *See* APA Addendum I (providing that a $50 million earnout payment is owed in Year 1 if the New PIUS Division generates at least $20 million in NCFI, as stipulated).

[131] *See Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) ("In Delaware, prejudgment interest is awarded as a matter of right."); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2025 WL 670818, at *13 n.117 (Del. Ch. Mar. 3, 2025) (collecting cases supporting the norm of quarterly compounded interest).

[132] *See supra* note 30 and accompanying text.

indemnification claim and accompanying written notice by Gallagher "in the manner provided in Section 9 of the [APA]."[133]

Agiato seeks an order compelling Gallagher to release the Escrowed Shares. He offers two grounds for that relief. First, he asserts that Gallagher failed to provide timely and proper notice of indemnification.[134] Second, he argues that Gallagher's indemnification claims fail as a matter of law.[135] Neither theory entitles Agiato to judgment in his favor; both raise material factual disputes.

### 1.    Timely and Proper Notice

Under the Escrow Agreement, notice "shall be deemed duly given . . . on the date sent . . . if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient."[136]

The parties entered into the Escrow Agreement on November 8, 2022, meaning that notice to the escrow agent was required on or before May 8, 2024 to prevent release of Escrowed Shares. Gallagher's counsel sent notice of its indemnifications claims at 6:50 p.m. Central Time on May 7, 2024, when it was

---

[133] *See supra* notes 31-34 and accompanying text.

[134] Agiato's Opening Br. 24.

[135] *Id.*

[136] Escrow Agreement § 7; *see also supra* note 61 and accompanying text.

27

received by the escrow agent.[137]  Agiato, who lives in North Carolina, received the email at 7:50 p.m. Eastern Time.[138]

Agiato believes that 6:50 and 7:50 p.m. are after "normal business hours," so the notice must "be deemed duly given" on "the next business day."[139]  He reads the requirement that notice be within 18 months to mean by 12:00 a.m. on the deadline.[140]  He further extrapolates that the phrase "next business day" means "during business hours" on that day.[141]  As such, he submits that Gallagher's notice was untimely because it was due by midnight but not technically received "until business hours on May 8, 2024."[142]

The meaning of "normal business hours of the *recipient*" is fact specific.[143] Agiato's and the escrow agent's typical business hours are unknown to me.  Agiato might work 9:00 a.m. to 5:00 p.m. Monday to Friday, or he might keep flexible hours, or perhaps some other industry-specific shift.  Even if 7:50 p.m. were after hours for Agiato, the Escrow Agreement does not explicitly state that notice is due

---

[137] Reply ¶ 79; *see also supra* note 62 and accompanying text.

[138] Agiato's Opening Br. 26.

[139] *Id.*; *see supra* note 136 and accompanying text (explicating the contractual language).

[140] *See* Agiato's Opening Br. 7 n.7, 25.

[141] *Id.* at 26.

[142] Agiato's Reply Br. 31.

[143] Escrow Agreement § 7 (emphasis added); *see supra* note 136 and accompanying text. The Escrow Agreement specifies that the *recipient's* normal business hours are the measure—not the commonly accepted meaning of business hours.

before 12:00 a.m. on the deadline. An equally reasonable reading is that "18 months from the date hereof" includes the entirety of Agiato's business hours that day.[144] In that case, notice sent any time on May 7 would be timely.

Agiato also contends that Gallagher's notice was deficient because it did not copy Smith, as required by Section 7 of the Escrow Agreement.[145] Gallagher's May 7 notice stated that Smith had asked to be removed from all correspondence going forward.[146] Whether Smith had, in fact, waived notice is not in the record, leaving me unable to resolve the effect of any waiver.

### 2. Viability of Indemnity Claims

Agiato maintains that he is entitled to judgment in his favor on the Escrowed Shares because Gallagher's indemnity claims fail as a matter of law.[147] But resolving whether Agiato breached the APA presents factual issues not properly resolved on the pleadings.

For example, Gallagher alleges that Agiato breached the representation in APA Section 6(g) that the Sellers' business was operated in the ordinary course because he failed to disclose the "development of a new deal structure" closing

---

[144] Escrow Agreement § 3.

[145] Agiato's Opening Br. 32; *see* Escrow Agreement § 7; *see also supra* note 34 and accompanying text (explaining the requirement); *supra* note 62 and accompanying text (noting Gallagher's address to the escrow agent and Agiato).

[146] *See supra* note 35 and accompanying text.

[147] Agiato's Opening Br. 24, 27.

shortly after the APA's execution.[148] It is unclear if the "new deal structure" was a significant diversion from the Sellers' normal business, and if it was solidified enough to be mentioned in their disclosure schedule.

Gallagher also contends that the representation in APA Section 6(o) requiring disclosure of conflicts of interest was breached because Agiato neglected to raise "interests in at least one customer of the Sellers."[149] It further claims that Agiato violated Gallagher's policies and procedures and placed his interests above those of Gallagher's stockholders.[150] Resolving these issues necessitates the presentation of evidence outside the pleadings.

## C.    Attorneys' Fees

Agiato seeks an award of attorneys' fees if the earnout payment dispute is decided in his favor.[151] He invokes the fee shifting provision in APA Section 20:

> In the event of an action at law or in equity between the parties hereto to enforce any of the provisions hereof, the unsuccessful party to such litigation or proceeding shall pay to the successful party all costs and expenses, including reasonable attorneys' fees, incurred therein by such successful party on trial and appeal as adjudged by the court, and if such successful party or parties shall recover judgment in any such action or proceeding, such

---

[148] Compl. ¶ 28; *id.* ¶ 63 ("Agiato breached the APA by failing to . . . disclose that PIUS and Newlight were branching into a new and untested line of business . . . ."); *see* APA § 6(g); *see also supra* note 19 (defining "Ordinary Course of Business").

[149] Compl. ¶¶ 21, 63; *see* APA § 6(o).

[150] Compl. ¶¶ 32-35; *see* APA § 4(b).

[151] Agiato's Opening Br. 2, 24; Oral Arg. Tr. 27.

30

costs, expenses and attorneys' fees may be included as part of such judgment . . . .[152]

This request is premature. Agiato has prevailed, in part. But his motion was denied on some claims, and others are not implicated in the motion. I cannot yet conclude that Agiato is the "successful party" in this litigation.

## III. CONCLUSION

Agiato's motion for partial judgment on the pleadings is granted in part and denied in part. Judgment is entered for Agiato and against Gallagher on Agiato's Count II and Gallagher's Count III. Agiato, as Sellers' Representative, is entitled to a $50 million Year 1 earnout payment plus prejudgment interest at the legal rate, compounded quarterly. His motion is otherwise denied as to Agiato's Count V and Gallagher's Counts I and II.

---

[152] APA § 20.